# M. E. Dunlap and George W. Colton, Assignees, Appts., *v.* J. C. Hilton.

It seems that $2 per day for each appraiser, for a reasonable number of days for the performance of the services required, is a proper fee for appraisers of real estate sold by assignees for the benefit of creditors, where no objection is made to such allowance—although the act of June 14, 1836, allows appraisers in such cases only $1 per day each.

NOTE.—By the assignment act of June 4, 1901, P. L. 404, no provision seems to be made for the appointment of appraisers, but § 15 directs the assignees to prepare a sworn inventory of the estate. To enable him to do so he may examine the insolvent or others on oath. Brindle's Estate, 27 Pa. Co. Ct. 191.

Expenditure of a reasonable sum by assignees for the benefit of creditors, in keeping buildings belonging to the assigned estate in repair for tenants, is allowable.

Assignees under a voluntary assignment for the benefit of creditors are not legally required to let the assigned real estate or to collect rents therefrom; and if they do so for the benefit of the estate, they are entitled to the allowance of a reasonable sum paid by them to one employed to collect such rents.

While it seems that, as a general rule, 2½ per cent on real estate and 5 per cent on personal estate are the proper commissions to be allowed assignees for creditors, on sales made by them, the rule is not inflexible; but each case must be governed by its own circumstances.

When the assigned real estate sold by assignees is encumbered by mortgages, the basis for their commissions is not to be limited to the sum realized by them over the encumbrances; but an allowance of 1½ per cent on the amount of the encumbrances is proper in addition to commissions on the sum actually realized.

The difficulty and risk connected with the furnishing of bonds by the assignees are, when the management of the estate is complicated and difficult, to be considered in fixing the compensation of the assignees.

In a case involving unusual labor and responsibility, an allowance to assignees of 6 per cent commissions on amounts realized by them in money, on sales of real estate, approved.

Rents collected from real estate assigned for the benefit of creditors should be applied on liens upon such real estate, in preference to distribution among the general creditors.

(Argued April 27, 1888.   Decided May 14, 1888.)

January Term, 1888, No. 386, E. D., before GORDON, Ch. J., PAXSON, STERRETT, GREEN, CLARK, and WILLIAMS, JJ. Appeal by M. E. Dunlap and George W. Colton, assignees of James Sill, under a general assignment for the benefit of creditors, from a definitive decree of the Court of Common Pleas of Erie County dismissing exceptions to the report of the auditor appointed to pass upon exceptions to the assignee's account and to make distribution, and confirming the report of the auditor, September Term, 1883, No. 128.   Affirmed.

The facts of the case and the questions presented are fully set forth in the report of the auditor, D. B. McCREARY, Esq., which was substantially as follows:

June 11, 1883, James Sill, of Erie, Pennsylvania, made an assignment of all his property for the benefit of his creditors and made M. E. Dunlap and S. S. Spencer his assignees. The real estate thus assigned was largely encumbered by mortgage and judgment liens at the time of the assignment. October 29, 1883, Mr. Spencer filed his declination as assignee, and on November 8, following, George W. Colton was appointed assignee in his place. January 15,1884, the assignees filed their bond in the sum of $360,000, which was approved by the court. Appraisers had been appointed in July, 1883, and filed their inventory and appraisement October 29 following, amounting to $180,000.

March 10, 1884, the assignees presented their first petition for an order from court to sell real estate. Other orders were subsequently made in reference to selling real estate. Under these various orders the first sales were made May 1, 1884, and continued from time to time until October 7, 1884, when practically the last sales were made—it appearing that August 11, 1886, real estate was sold amounting to $67, and on the 12th of the same month the personal property was sold amounting to $278. November 22, 1886, the assignees filed their account. Exceptions to this account were filed by J. C. Hilton, assignee of the Humboldt Safe Deposit & Trust Company; and it is upon these exceptions that the contention before the auditor arises.

It appears from the evidence that a large amount of the indebtedness of the assignor consisted of first mortgages and the real estate so mortgaged was sold subject thereto. The amount actually realized from the sale of real estate as appears by the assignees' account was $12,463.60. The Humboldt Safe Deposit & Trust Company was a mortgage and judgment creditor of the assignor, to a large amount, and had a first claim upon the above fund as well as upon the rents collected from the real estate pending the sale, to which reference will be made hereafter. The Deposit & Trust Company gave its receipts amounting to $9,764.10 to apply on its liens as above stated.

The rents collected as stated above amounted to the sum of $2,029.59, and the personal property was sold for $278. The total amount realized from the sales of real estate, from the collection of rents and from the sale of personal property was $14,

717.19.   This amount was accounted for by the assignees as follows:

Amount receipted for by the Humboldt
  Safe Deposit & Trust Company as before
  stated . . . . . . . . . . . . . . . . . . . . . . . . . . .$9,764  10
.Disbursements per schedule "B" of account  1,985  73
Amount charged by assignees for services  3,021  36

$14,771.19

Hilton, assignee of the Safe Deposit Company, filed six exceptions to the account.   The first, second, and sixth were not pressed, nor was any evidence or authorities offered in their support and they are hereby dismissed.

The third exception is to the allowance of $400, paid to the appraisers for making appraisement, as set forth in voucher No. 49, as being grossly excessive and because said appraisement was deceptive and misleading.   Considerable testimony was taken on both sides on this exception, with widely conflicting conclusions on part of the witnesses.   The voucher is made out in a lump sum and does not show the number of days employed by the appraisers in this service.   William P. Hayes, a real-estate dealer, testified that the total appraisement could have been made in ten or fifteen days, but inasmuch as there was some of the real estate in different places outside the city of Erie, he fixed the total compensation at about $100.   James McCracken thought the whole appraisement could have been made for $40 or $50.   Both of these witnesses testified that they had had considerable experience in valuing real estate.   S. Z. Smith and Geo. W. Colton, the appraisers, testified generally that they expended a large amount of time in making the appraisements, the latter stating that they worked at it from the time of their appointment, which was July 11, 1883, until they finished on the 25th of October following.   M. E. Dunlap testified that there were sixty-nine separate pieces of real estate and five items of personal property appraised.

No act of assembly was cited, except the act of June 14, 1836, which allows appraisers in such cases $1 a day each; nor has the auditor been able to find any act authorizing the payment of a larger sum, although, as the auditor believes, the practice

has been to allow $2 per day for each appraiser—which is certainly little enough.   No objection was made to the latter sum, for a reasonable number of days, and the auditor is disposed to allow that amount.   It is very difficult, in view of the conflicting testimony and in view of the fact that the time spent is not specified in the vouchers, which should have been done, as the law fixes a *per diem* allowance, to determine what would be a proper compensation.   It is evident, however, that $400 is a greater sum than the law would allow, especially as there were but sixty-nine pieces of real estate to appraise.

The auditor is disposed to allow for more than usual difficulties connected with this appraisement; but making this allowance he is of opinion that forty-five days would be ample time to perform the services.   This at $2 per day would amount to $180; and he therefore finds that to be the proper amount for making the appraisement.   It might be remarked that according to Mr. Colton's testimony they were exactly ninety days employed—excluding Sundays—from the time they began to the time they finished.   This, at the amount fixed by law, $1 per day, would make the above amount.   This, therefore, seems to the auditor to be a fair allowance.

The fourth exception is to vouchers Nos. 48 and 50.   The first, amounting to $23.11, is for materials and labor in keeping buildings in repair for tenants.   The credit claimed in voucher No. 48 seems to be a reasonable one, and the sums expended as therein set forth proper and necessary; and the exception to this voucher is dismissed.   Voucher No. 50 included in this exception is a claim of credit of $395.40 paid to S. Z. Smith for collecting rents, exceptant alleging that this duty belonged to the assignees, and should have been paid out of their own allowance.

· In Detwiler's Appeal, 96 Pa. 323, it is held that "a voluntary assignment for the benefit of creditors does not impose upon the assignee any duty to let the real estate, and where an assignee permits the assignor to remain in possession and use the real estate he is not chargeable with the rental thereof."

So much, therefore, of the exception as alleges that it was the duty of the assignees to collect the rents is not tenable.   The assignees are entitled to commendation for assuming the charge of the rentals and thus increasing the assets of the assigned estate.   It must be remembered that none of the property was

very available for renting and that it was greatly scattered and necessarily required great vigilance in securing the rents. An examination of schedule "A" will show that there were 420 separate payments of rents ranging from $1 upwards, the majority, perhaps, being under $5. This, together with the care of the property, necessarily required much time and labor. The auditor is, therefore, of the opinion that the credit claimed in voucher No. 50, although seemingly a large one, is, under all the circumstances of the case, a reasonable one; and the fourth exception is hereby dismissed.

The fifth exception is made to the claim of $3,021.36 by the assignees for their services in settling the assigned estate, exceptant alleging that such amount is excessive.

It was claimed by counsel for exceptant on the argument that the rule for compensation of administrators and other trustees as fixed by the supreme court of Pennsylvania was 2½ per cent commission on real estate and 5 per cent on personal property, and that if more than that rate was charged, it devolved upon those claiming to prove that the amount and nature of the services rendered entitled them to a higher rate. In support of this position they cited Eshleman's Appeal, 74 Pa. 42; Carrier's Appeal, 79 Pa. 230; Duval's Appeal, 38 Pa. 112, and numerous other decisions of the supreme court of Pennsylvania, all of the same tenor. This position was not combated by the counsel for the assignees, so far as regarded the rule laid down in the authorities quoted; but it was contended that inasmuch as the same authorities held that there could be no inflexible rule established, but that each case must be governed by its own facts and circumstances, therefore the decisions quoted by counsel for exceptant were not applicable to and could not govern the determination of the compensation to be allowed in this case unless the facts and circumstances under which those decisions were rendered were similar or nearly so to the facts and circumstances of the case under consideration.

An examination of the above and other authorities satisfies the auditor that the rule of law as stated by counsel for exceptant has been uniformly adhered to by the supreme court of Pennsylvania, together with the further ruling that no inflexible rule can be established, but must be determined by the facts and circumstances in each particular case.

In Carrier's Appeal, 79 Pa. 230, Judge PAXSON says, on

page 234: "While the question of the compensation of trustees is not to be determined by any inflexible rule but must depend to a great extent upon the circumstances of each particular case, yet 2½ per cent has generally been regarded as a proper compensation for the sale of real estate." ·

In Duval's Appeal, before quoted, Judge STRONG, on pages 119 *et seq.*, says: "It is believed that the common practice has been to allow commissions upon the amount of sales of real estate at a rate not greater than 3 per cent unless the execution of the trust has been attended with unusual difficulty."

Such is the tenor of all the decisions upon this question; and many of the cases, upon which these decisions were given, as appears from the history of the case, involved much labor and responsibility on part of trustees—their settlement extending a great many years and being more or less intricate.

Under the general rule as thus held, the question to be determined by the auditor in the case before him is whether the facts and circumstances attending the discharge or the execution of their trust by the assignees entitle them to an increase in their compensation beyond the rate laid down in the general rule established by the supreme court, as above stated, and, if so, to what extent. The assignees do not state in their account what rate per cent they charge for their services, nor do they state whether the amount claimed is a commission upon the amount of money realized from the sales of the assignor's estate. If the latter is a basis of their compensation, the commission would amount to about 25 per cent. This is so far in excess of the rate allowed under the general rule heretofore stated, regulating the compensation of trustees, that nothing but the most extraordinary circumstances could justify it.

It would not be just to allow them a commission on the $2,029.59 of rents collected by S. Z. Smith, for they claimed a credit of nearly 20 per cent of the rents collected, paid to Smith for such collection, which amount has already been allowed by the auditor; and it appears to him that this allowance is amply sufficient, without subjecting the amount of rents to any additional commission.

The first practical business of the assignees was the filing of their bond January 15, 1884. Two months thereafter they presented their petition to court for the sale of real estate, and on the first of May the first sales were made, and the last sale

but one was made October 9, 1884, six months from the first sales; and the next day a return of sale was made to court. August 11, 1886, a sale of real estate amounting to $67 was made and the next day the personal property was sold, amounting to $278.

There were in all fifteen times appointed by adjournment and otherwise for sales of real estate, at six of which no sales were made. It is true that after the first petition was presented on March 10, 1884, for authority to sell, and down to the time the last sale was made, there were numerous supplemental petitions presented and various orders of court made regulating the sales; but this service belonged to their counsel to perform, under whose instruction, as testified to by M. E. Dunlap, the assignees were acting, and for which services as well as for such other professional service as they required, they paid $306, to apply on account as appears by voucher No. 47—which amount would seem to be a reasonable compensation for all legal services necessary in the settlement of the assigned estate.

It does not appear that there was any litigation involved in the performance of their duty as assignees, such as contested trials in court for the collection of debts, or establishing or defending titles, which often occur in similar trusts, and which frequently involve much labor and responsibility.

As has been already stated a large amount of the real estate was sold subject to first mortgage liens. The amount of such mortgages, as appears by a list of liens in evidence, was in round numbers $28,000. It was claimed by counsel for exceptants that some of these mortgages were, in fact, in whole or in part, paid. The record, however, does not show such payments; and it is to be presumed that the assignees were governed by the record. It was also claimed by counsel for exceptants that the assignees were not entitled to compensation on such sales, except a reasonable commission on what the property sold for over and above the amount of such mortgages; that they simply sold the interest of the assignor in the premises, which is to be measured by the amount realized over the mortgages, and that the mortgages must be adjusted between the mortgagees and the purchaser, without any responsibility on the part of the assignees.

At first thought the auditor was inclined to this view of the question, but further reflection satisfies him that this view is erroneous and that it would work injustice to the assignees.

They are required to sell the real estate so encumbered by first mortgages, the same as if such mortgages did not exist, for perchance the real estate may be worth more than the amount of such mortgages, and something may be realized for the benefit of other creditors, and, so far as the sale is concerned, their labors would be as great in such sales as in any other—although this responsibility would cease with the sale, not having to account for the mortgage debts.

If compensation in such cases is to be based entirely upon a commission on the amount of money realized from the sales, it is difficult to understand from what source trustees would secure their compensation in cases where a large proportion of the real estate was encumbered by first mortgage liens to its full value.    Inasmuch, however, as the duties of the assignees in this case ceased with such sales, and they incurred no labor or responsibility as to the amount of money represented by these mortgages, and as the amount of the same is large, their compensation for such sales should be rated accordingly.

In the opinion of the auditor 1¼ per cent on the amount of first mortgages would be a sufficient compensation for the selling of the real estate so encumbered.

It was contended by counsel for accountants that the giving of the bond by the assignees in the sum of $360,000 is a proper subject to be considered in fixing their compensation, while counsel for exceptant vigorously contested this position.    Ordinarily, the giving of bonds by administrators and other trustees does not enter into the question of compensation, at least *eo nomine* so far as the rulings of the court indicate.    Generally the amount of such bonds is not very large and the estates to be administered upon not attended with unusual risks or difficulties, and securing bonds in such cases is not attended with much difficulty.    It is otherwise, however, in an estate attended with more than ordinary complication, as was evidently the case in this instance, and where the bond required was so large in amount.    Where many responsible persons would be willing to sign a bond for a trustee in a reasonable amount, very few would be willing to sign one of such magnitude as the one in question. The financial consequences in case of liability are so overwhelming that most prudent men will hesitate long before assuming even a remote risk.    Such considerations necessarily add to the labors of persons required to furnish such bonds; and

the auditor, therefore, holds that the giving of the bond in this case is a legitimate matter for consideration in fixing the compensation of the assignees.

The auditor also believes from the evidence in this case that more than ordinary labor devolved upon the assignees. The fact that so many petitions were filed, so many orders made, and so many adjournments had, whoever was responsible therefor and whatever may have been the necessity, go to show that the difficulties connected with the settlement of this estate were greater than attended the settlement of estates in which the general rule as to compensation should be held applicable.

After a careful examination and consideration of all the evidence and the circumstances of this case, the auditor has arrived at the following conclusions, growing out of the fifth exception, as to the compensation of the assignees in this case:

On the personal estate amounting to $278 he allows a commission of 5 per cent, which is according to the general rule hereinbefore stated. The sale of the personal property seems to have been attended with but little trouble, there being but one sale.

On the amount of sales in cases of first mortgages as before stated he allows a commission of 1¼ per cent, on the amount of said mortgages, the same amounting in round numbers to $28,000.

On the amount realized of money from sales of real estate, as shown by assignees' account, amounting to $12,463.60, he allows a commission of 6 per cent. This allowance is 3½ per cent greater than the amount established as the general rule in Duval's Appeal, 38 Pa. 112, and the auditor believes that the increase which he has allowed is sufficient to cover the extra labor and responsibility which this case called for beyond the usual amount of labor and responsibility involved in the settlement of estates by trustees.

A question was raised as to whether the rents collected from the real estate of the assignors should be paid *pro rata* among the general creditors, or whether the same belonged to mortgages and judgments in the order of their liens. Wolf's Appeal, 15 W. N. C. 162, decides in favor of the latter. The syllabus of the case is as follows: "Rents of land in the hands of the assignees for the benefit of creditors, being solely the product of

the land itself, should be applied on those prior liens which would be entitled to the land if sold."

As appears by a certified list of liens in evidence in this case the Humboldt Safe Deposit & Trust Company held mortgages amounting to $17,000 and judgments amounting to $22,908.75 against the assignor, which were prior to all other liens excepting the first mortgages hereinbefore referred to.    By virtue of these liens they receipted for $9,764.10, which was all the money realized from the sales and from rents, excepting the amounts held by the assignees for charges and expenses.    It is, therefore, clear to the auditor that the amount with which the assignees are surcharged in this report, less costs as before stated, should be appropriated to the liens thus held by the Humboldt Safe Deposit & Trust Company, about $30,000 of which yet remains unsatisfied.

Both the accountants and the exceptant filed exceptions to the auditor's report; whereupon, the auditor made the following report on such exceptions:

The exceptions filed raise substantially the same questions that were raised and ably argued in the hearing on the exceptions to the account; and the auditor, after a careful re-examination of the case, does not feel disposed to disturb the conclusions of law or fact which he arrived at in his report; and the exceptions to his report, filed as above stated, are therefore overruled.

In this connection the auditor feels it to be his duty to refer to the sixth exception of exceptant to the account and the seventh exception to the auditor's report, in which it is claimed that accountants should be charged with interest on the money in their hands from the time they closed the sales in October, 1884.    On the face of it the claim would seem to have some foundation in reason.    The sales under the order of court were cash sales; and although there was conflicting testimony as to the cause of the delay in filing their final account, the delay was not satisfactorily accounted for to the mind of the auditor, and he would feel disposed to sustain the exceptions, were it not that equitable considerations incline him to a contrary opinion.

The auditor held in his report, under the authority of Detwiler's Appeal, therein cited, that the assignees were not legally required to lease the real estate and collect the rents.    They, however, did so and increased the assets of the estate thereby

about $2,000, which is just about the amount with which he has surcharged the assignees in his report. Inasmuch, therefore, as they voluntarily added this sum to the assets of the assigned estate it would scarcely be equitable to compel them to account for intrest thereon besides, especially as there was no evidence that they received any interest. The auditor would further add that he may possibly have' erred in holding that the assignees were not entitled to a reasonable commission on the amount or rents over and above the amount they paid to S. Z. Smith for collecting the same, which he held, under all circumstances, to be a reasonable compensation. They, of course, were compelled to receive and be responsible for the rents so collected, and it would perhaps have been only fair to allow them 2½ per cent on the amount. It, therefore, appears to the auditor that under all the circumstances of the case they should not be charged with interest as claimed in the exceptions.

The exceptions were thereupon renewed in court, where they were overruled per Brown, P. J., and a decree entered confirming the auditor's report and making distribution accordingly.

Thereupon the accountants, assignees, took this appeal, assigning as error the action of the court: (1) In overruling the second exception to the auditor's report—to wit, "The auditor erred in not dismissing the fifth exception to the account of the assignees, and in not sustaining the amount charged as compensation for services rendered;" (2) in overruling the fourth exception to the auditor's report, to wit, "The auditor erred in not deciding as a matter of fact that the exceptant had not submitted any evidence as to the value of the services of the assignees, and therefore had not furnished any basis for the reduction of the amount claimed by the assignees for compensation;" (3) in overruling the fifth exception to the auditor's report, to wit, "The auditor erred in not allowing compensation for the collection of rents, etc., over and above the amount allowed and paid to Samuel Z. Smith;" (4) in overruling the sixth exception to the auditor's report, to wit, "The auditor erred in finding that the first mortgages on real estate sold, to which the sales were made subject, only amounted to $28,000; whereas, in fact, they amounted to over $60,000 as shown by the evidence;" (5) in overruling the seventh exception to the auditor's report, to wit, "The auditor erred in not finding as a fact, and

holding as a matter of law, that under the circumstances of this case the assignees were entitled to receive and retain the amount charged in their account for services—considering in this connection the difficulty in furnishing a bond of $360,000 and the responsibility thereby assumed; the amount and complicated character of the estate as well as the large amount and responsible character of the services rendered;" and (6) in confirming that portion of the auditor's report which reduces the compensation of the assignees from $3,021.36 to $1,111.72.

*S. M. Brainerd* for appellants.

*Joseph M. Force* and *Henry C. Yard* for appellee.

PER CURIAM:
Finding no error in the decree of the court below, we order it to be affirmed and the appeal dismissed, at costs of appellants.